## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RSUI INDEMNITY COMPANY**                           **CIVIL ACTION**

**VERSUS**                                                    **NO. 12-2820**

**AMERICAN STATES INSURANCE**                     **SECTION I**
**COMPANY**

### FINDINGS OF FACT & CONCLUSIONS OF LAW

Following a bench trial in the above-captioned matter on June 22, 23, and 24, 2015, the Court makes the following findings of fact and conclusions of law.

### FACTS

Ameraseal, Inc. ("Ameraseal") was insured by a primary liability insurance policy issued by defendant, American States Insurance Company ("ASIC"), and an excess liability insurance policy issued by plaintiff, RSUI Indemnity Company ("RSUI").[1] ASIC's primary policy limit was $1,000,000.00 and RSUI's excess policy limit was $4,000,000.00 in excess of ASIC's policy limit.[2] Accordingly, ASIC insured Ameraseal up to $1,000,000.00, and RSUI insured Ameraseal between $1,000,000.00 and $5,000,000.00.

On June 23, 2010, Lamar Thomas ("Thomas"), an employee of Ameraseal, was involved in a car accident with Stacia Barrow ("Barrow"). On June 8, 2011, Barrow, represented primarily by Michael J. Frugé ("Frugé"),[3] filed a lawsuit ("the Barrow lawsuit") in the 18th Judicial District Court for the Parish of West Baton Rouge against Ameraseal and Thomas (collectively, "the

---

[1] R. Doc. No. 195, stipulations 3, 4.
[2] R. Doc. No. 195, stipulations 3, 4.
[3] R. Doc. No. 195, stipulation 9; Testimony of Frugé.

1

insureds") as well as ASIC.[4] ASIC assigned the Barrow lawsuit to claims handler Casey Hougen ("Hougen") and staff counsel Brad Brumfield ("Brumfield").[5] At an August 22, 2011, scheduling conference, the state court ordered the parties to complete discovery by January 11, 2012.[6]

From August 22, 2011, through December 2011, ASIC's adjuster and staff counsel did little to defend the lawsuit. However, as will be explained below, the Court need not decide whether some or all of ASIC's actions or inactions warrant a finding of bad faith and the Court will not, therefore, address RSUI's bad faith allegations at length.

On September 15, 2011, Barrow filed a motion for partial summary judgment with respect to liability.[7] Brumfield did not oppose the motion or appear at the motion hearing.[8] Accordingly, the state court granted the motion and held that Thomas's negligence was the sole cause of the accident.[9]

Hougen was replaced by ASIC adjuster Brent Colton ("Colton") on December 14, 2011.[10] On the same date, Brumfield filed a motion for an extension of time to complete discovery.[11]

On December 28, 2011, RSUI first received notice of the Barrow lawsuit.[12]

At a hearing held on January 12, 2012, the state court denied ASIC's motion for an extension of time to complete discovery and it set a jury trial date of March 27, 2012.[13]

On January 19, 2012, RSUI retained George P. Hebbler, Jr. ("Hebbler") to represent it in

---

[4]R. Doc. No. 195, stipulation 9.
[5]R. Doc. No. 195, stipulation 10; Testimony of Brumfield.
[6]R. Doc. No. 195, stipulation 14; Testimony of Brumfield.
[7]R. Doc. No. 195, stipulation 16; Exhibit 41.
[8]R. Doc. No. 195, stipulation 17; Testimony of Frugé.
[9]Exhibit 46.
[10]R. Doc. No. 195, stipulation 21; Testimony of Colton.
[11]R. Doc. No. 195, stipulation 22; Testimony of Brumfield.
[12]R. Doc. No. 195, stipulation 28.
[13]R. Doc. No. 195, stipulation 32.

connection with the lawsuit.[14]

ASIC reassigned the defense of the case from Brumfield to outside counsel, Andrew Eversberg ("Eversberg"), on February 2, 2012.[15]

On February 14, 2012, Colton increased ASIC's reserve to the remaining policy limits and authorized Eversberg to settle with Barrow for the remainder of ASIC's $1,000,000 primary policy limits.[16]

On February 15, 2012, Eversberg sent an email to Frugé stating that any settlement demand by Barrow "has got to be one that can be accepted – limits for release of insured. If the insured won't be protected then the insurer can't accept it."[17]

In a letter dated February 16, 2012, Barrow made her first and only settlement demand for the full limits of both ASIC's and RSUI's policies.[18] In a letter dated February 16, 2012, Eversberg informed Colton and the insureds that Barrow had demanded both ASIC's and RSUI's policy limits.[19] Eversberg also explained that his authorization to offer ASIC's policy limits required that Barrow "has to agree to release Lamar Thomas, Ameraseal and [ASIC] from this litigation."[20] Eversberg stated that he would speak with Frugé and attempt to secure the release Thomas and Ameraseal.[21] The insureds would, however, remain as defendants in the case in order to allow

---

[14]R. Doc. No. 195, stipulation 38; Testimony of Hebbler.

[15]R. Doc. No. 195, stipulation 40; Testimony of Eversberg.

[16]R. Doc. No. 195, stipulation 42; Testimony of Colton. The testimony at trial established that ASIC had previously paid Barrow approximately $9,000 for vehicle damage. Testimony of Frugé.

[17]Exhibit 108.

[18]Exhibit 109.

[19]Exhibit 111, at ASI-392.

[20]Exhibit 111, at ASI-392.

[21]Exhibit 111, at ASI-392.

Barrow to proceed against the excess insurer.[22] There would need to be an understanding that there

could never be a judgment with any monetary exposure to Lamar Thomas or Ameraseal.[23]

On February 16, 2012 states that Eversberg

A claim file note written by Colton which is dated February 16, 2012 states that Eversberg

felt "that if our settlement effectively protects the insd and insd driver by getting covenants not to

execute against them and limiting pltf's additional recovery to proceeds available under the excess

policy, then the exhaustion of our policy limits may be a good faith action that would relieve us of

further defense obligation through settlement."[24] Eversberg testified that he would have explained

to Colton what a *Gasquet* settlement is.[25]

On February 17, 2012, ASIC filed with the Louisiana First Circuit Court of Appeal an

application for a supervisory writ with respect to the denial of the motion for a discovery extension.[26]

On February 17, 2012, Eversberg sent to Frugé a settlement offer of ASIC's primary policy

limits in exchange for Barrow's agreement to:

1.  Release Ameraseal, LLC and Lamar Thomas from any liability for damages
    in excess of the available insurance limits provided by American States
    Insurance Company and the excess insurer, RSUI Indemnity Company, with
    Ameraseal, LLC and Lamar Thomas to remain as nominal defendants, only,
    in accordance with the customary practice approved in *Gasquet*, reserving
    unto Plaintiff her claim against RSUI Indemnity Company.
2.  Release American States Insurance Company from any and all claims, and
    dismiss American States Insurance Company from above-referenced suit
    with prejudice; and
3.  Indemnify, defend and hold harmless American States Insurance Company,
    Ameraseal, LLC and Lamar Thomas from any and all medical liens,
    privileges, contractual reimbursement claims, Medicaid, Medicare, or any
    other such entity that may have paid medical expenses to or on behalf of

---

[22]Exhibit 111, at ASI-392.
[23]Exhibit 111, at ASI-392.
[24]Exhibit 112.
[25]Testimony of Eversberg.
[26]Exhibit 179; Testimony of Eversberg.

4

Plaintiff.[27]

On February 18, 2012, before Barrow responded to that offer, Eversberg wrote to Colton and the insureds and characterized the settlement offer as "releas[ing] Ameraseal and Thomas for any personal exposure," although they "would have to remain named Defendants in the case so that the Plaintiff could potentially obtain a verdict that the excess carrier would be required to pay, but Ameraseal and Thomas would never had [sic] any financial exposure."[28]

On February 19, 2012, Frugé wrote to Dave Woolridge, an attorney for Ameraseal, stating that he was "close to resolving with the underlying insurer, who is protecting your clients' interest and will ensure no excess judgment can be rendered against your client, i.e. they will have no further exposure above the excess insurance."[29] Frugé requested that Woolridge confirm that the insureds would consent to dismissing the pending application for a supervisory writ, which Frugé needed "in order to let your clients go."[30] Frugé stated that he assumed "this is more than agreeable, as they will be off the hook for any future liability."[31]

Also, on or about February 19, 2012, Frugé accepted the February 16, 2012 offer on behalf of Barrow.[32] The written acceptance of the offer did not change any of the proposed settlement terms,[33] and the credible testimony at trial established that dismissal of the pending supervisory writ application was not a condition or term of the settlement agreement.[34]

---

[27]Exhibit 113; Testimony of Eversberg.
[28]Exhibit 114.
[29]Exhibit 117.
[30]Exhibit 117.
[31]Exhibit 117.
[32]Exhibit 113; R. Doc. No. 195, stipulation 44.
[33]Exhibit 113 ("Drew, Mrs. Barrow accepts. M. Frugé").
[34]Testimony of Eversberg; Testimony of Frugé.

On February 21, 2012, Frugé sent an email to Hebbler stating that:

The offer to settle from [ASIC], which I believe you have a copy of, does not seek the dismissal of your insureds, only [ASIC]. The offer merely releases them from any judgment above $5 million. In other words, they are still on the hook from $1 million to $5 million, which is your client's layer of insurance. As such, I do believe excess has a skin in, would have to assume the defense, and I don't have to add them to suit for them to be responsible for any judgment.[35]

On February 22, 2012, Eversberg's associate, Brad Boudreaux ("Boudreaux"), sent a letter to Hebbler asserting that a settlement had been reached between Barrow, ASIC, and the insureds "in accordance with *Gasquet*" and that the insureds "will remain in the case as nominal defendants."[36]

On February 22, 2012, Boudreaux sent a draft of a Receipt and Release to Colton and Eversberg.[37] The draft included provisions expressly stating that the insureds would not make any further payments to Barrow, and that Barrow could never collect any damages personally from the insureds.[38]

On February 24, 2012, RSUI settled with Barrow for $2,000,000.00.[39]

## PROCEDURAL HISTORY

RSUI filed this lawsuit against ASIC on November 26, 2012.[40] RSUI alleged that ASIC breached a duty of good faith it owed to the insureds in the Barrow lawsuit and, as a result, RSUI was forced to pay $2,000,000 to Barrow to settle the insureds' additional exposure.[41] RSUI sued,

---

[35]Exhibit 126.

[36]Exhibit 121.

[37]Exhibit 125.

[38]Exhibit 125, at ASI-220, -221. The testimony at trial established that this draft was never executed because RSUI settled with Barrow before it could be executed, obviating any need for the additional release language.

[39]R. Doc. No. 195, stipulation 45.

[40]R. Doc. No. 1.

[41]R. Doc. No. 1, at 6-7.

alleging that it was subrogated to the insureds' rights against ASIC.[42]

On November 13, 2013, the Court granted a motion for summary judgment filed by ASIC, concluding that "the absence of an adjudicated excess judgment in this case bars RSUI's claim."[43] RSUI appealed and the U.S. Court of Appeals for the Fifth Circuit reversed and remanded. *RSUI Indem. Co. v. Am. States Ins. Co.*, 768 F.3d 374 (5th Cir. 2014).

On April 7, 2015, RSUI filed an amended complaint adding allegations that (1) ASIC failed to keep the insureds informed of developments in the case and of the potential exposure to excess liability, and (2) that the settlement between Barrow, the insureds, and ASIC did not include a *Gasquet* release.[44]

The Court ordered the parties to submit post-trial briefing "with respect to the following issues: (1) whether the evidence is sufficient to support a finding that the settlement entered into by ASIC, the insureds, and Barrow is a valid *Gasquet* settlement and, if so, the effect of such a finding in this case; and (2) causation, including but not limited to the effect of a finding by the Court that ASIC abandoned a viable comparative fault defense."[45] The Court received the post-trial briefs and responses.[46]

## LAW AND ANALYSIS

As stated, ASIC was the primary insurer and RSUI was the excess insurer for their common insureds. Both ASIC and RSUI settled with Barrow close to trial. RSUI now seeks from ASIC the amount it paid to Barrow, contending that ASIC's breach of its duty to the insureds during the

---

[42]R. Doc. No. 1, at ¶¶ 25-26.
[43]R. Doc. No. 42, at 4.
[44]R. Doc. No. 111.
[45]R. Doc. No. 201.
[46]R. Doc. Nos. 203, 204, 205, 206.

defense of the Barrow lawsuit resulted in RSUI's settlement payment to Barrow.

This case implicates interesting factual and legal issues, but the Court finds it necessary to address only two, both of which are independently dispositive and preclude RSUI's recovery from ASIC. First, pursuant to Louisiana law, RSUI can only recover from ASIC if it is subrogated to the insureds' rights against ASIC. The Court finds that the insureds had no claim against ASIC in light of the settlement agreement and release ASIC obtained from Barrow for the benefit of the insureds. Consequently, the insureds had no claim against ASIC to which RSUI can be subrogated.  Second, even if the insureds had a viable claim against ASIC, RSUI has failed to establish by a preponderance of the evidence that ASIC's breach of its duties to the insureds caused RSUI to pay a particular amount more than it otherwise would have paid.

## I.      RSUI is Subrogated to the Rights of the Insureds Who Had No Claim Against ASIC

Resolution of this issue depends on the interaction of several aspects of Louisiana law governing the relationship between the primary and excess insurers of a common insured. First, the Court will explain the well-settled framework pursuant to which an excess insurer may pursue damages from a primary insurer. Second, the Court will explain why the release ASIC obtained for the insureds was a "*Gasquet*" release. Third, the Court will explain why, notwithstanding RSUI's claim that it is subrogated to the insureds' rights, the facts and circumstances of this case lead to a finding that a valid *Gasquet* release defeats RSUI's ability to recover from ASIC.

### A.      *Great Southwest* and an Excess Insurer's Rights Against a Primary Insurer

In the first appeal taken in this case, the Fifth Circuit succinctly explained the Louisiana Supreme Court's holding in *Great Southwest Fire Insurance Company v. CNA Insurance Companies*, 557 So. 2d 966 (La. 1990), that an excess insurer may recover payments allegedly

caused by the primary insurer's conduct only through subrogation to the insured's rights against the primary insurer:

> The leading Louisiana authority on an excess insurer's claims for a primary insurer's alleged breach of the duties to defend and to settle is *Great Southwest* . . . . and resolution of the instant dispute must begin there. In *Great Southwest*, an excess liability insurer sued a primary insurer to recover for sums paid because of the primary insurer's alleged bad faith failure to defend properly and failure to settle a lawsuit against their common insured. In that case, a judgment had been entered in the underlying lawsuit against the insured that exceeded the limit of the primary policy. The primary insurer paid its policy limit, and the excess carrier paid the portion of the judgment above that limit.
>
> The Louisiana Supreme Court reasoned that both insurers were solidarily obliged to the insured to pay on its behalf the excess portion of the judgment, but for different reasons. The excess carrier was obligated because of its contractual promise to pay damages above the primary policy limits. But the primary carrier was obligated because of its responsibility for all damages arising as "a direct consequence of its bad faith failure to perform." The state supreme court determined that the primary insurer's bad faith had caused the excess judgment and that because the excess insurer satisfied the solidary obligation, the excess insurer thereby relieved the primary insurer of the primary's obligation to the insured and was entitled to seek recovery from the primary insurer. The court held that this right of recovery by the excess insurer from the primary insurer arose by means of subrogation.

768 F.3d at 378 (citations omitted); *see also Great Southwest*, 557 So. 2d at 967-69. But *Great Southwest* is equally clear that an excess insurer cannot recover directly from the primary insurer because the primary insurer does "not owe a duty of care or even of good faith performance to the excess insurer of its insured." *See* 557 So. 2d at 971.

After *Great Southwest*, it is settled law in Louisiana that "if the excess insurer is to recover from the primary insurer for acts which make the excess insurer's contract and liability more burdensome, it must do so by asserting *the insured's* rights after becoming subrogated to them or

after acquiring them through assignment." *Id.* (emphasis added).[47]

### B.     The ASIC/Barrow Settlement and the *Gasquet* Release of the Insureds

Because RSUI can recover from ASIC only "by asserting the insured[s'] rights after becoming subrogated to them," *id.*, the Court must decide what rights the insureds had against ASIC for ASIC's alleged breach of its duty to defend them in good faith. If the insureds were not injured by ASIC's actions or inactions, they then have no viable claim against ASIC. If the insureds have no viable claim against ASIC, then pursuant to *Great Southwest*, RSUI is subrogated to nothing.

The question of the insureds' claim against ASIC turns on the interpretation of the purported release of the insureds in the ASIC/Barrow settlement. According to ASIC, it obtained for the benefit of the insureds a "*Gasquet*" release of any further personal exposure to Barrow. On the other hand, RSUI argues that the release was not a *Gasquet* release as it left the insureds exposed to additional liability which RSUI satisfied on behalf of the insureds by settling with Barrow. The Court will first discuss what the parties meant by a "*Gasquet*" release. It will then examine the settlement and the relevant parol evidence in order to determine whether the parties to the February 19, 2012 ASIC/Barrow settlement intended a *Gasquet* release of the insureds.

### 1.)     *Gasquet* Releases

The testimony at trial and the Court's own research establishes that Louisiana lawyers use

---

[47]Somewhat cryptically, the Louisiana Supreme Court observed that "[i]n a proper case, it may be possible for the excess carrier to recover directly from the primary insurer for damage caused by an abuse of right." *See* 557 So. 2d at 971. RSUI has not articulated any arguments based on this reference to the doctrine of abuse of rights. *See Mass. Mut. Life Ins. Co. v. Nails*, 549 So. 2d 826, 829 (La. 1989) ("If a party has a legitimate and serious interest in exercising a contractual right, he may do so even if it causes harm to another. However, if a party does not have a legitimate and serious interest in the exercise of the right, and to do so would bring unnecessary harm to another, the doctrine of abuse of rights will bar the exercise of the right.").

"*Gasquet*" as a term of art to denote a type of release in which a plaintiff settles with and releases a defendant insured and its primary insurer, but reserves his or her right to pursue additional amounts available through the insured's excess insurance policy.[48] *See* William Shelby McKenzie & H. Alston Johnson, III, 15 La. Civ. L. Treatise § 7:12 ("The release approved in *Gasquet v. Commercial Union Insurance Company* should be used as a form for settlement with the primary carrier which reserves rights against the excess insurer.").

A "*Gasquet*" release takes its name from *Gasquet v. Commercial Union Ins. Co.* 391 So. 2d 466 (La. App. 4 Cir. 1980), *writ denied* 396 So. 2d 921 (La. 1981). In *Gasquet*, an injured plaintiff sued an alleged tortfeasor, as well as the tortfeasor's primary and excess insurers. *See id.* at 468. Before trial, the plaintiff settled all claims against the primary insurer and it also released the tortfeasor "from all claims which might be recovered from [the tortfeasor] directly, but specifically reserving his claims only to the extent that collectible coverage is afforded to [the torfeasor] by" the excess policy. *See id.* at 470-71. The Louisiana Fourth Circuit Court of Appeals held that "Louisiana jurisprudence support[ed] the settlement made by plaintiff with his primary insurer." *Id.* at 471.

Accordingly, by executing a *Gasquet* release in a settlement agreement, a plaintiff (1) releases the primary insurer entirely, and (2) releases the insured "from all claims which might be recovered from [the insured] directly," reserving claims against the insured "*only* to the extent that *collectible* coverage" is afforded by an excess insurance policy. *Gasquet*, 391 So. 2d at 470-71 (emphasis added).[49] Procedurally, after a *Gasquet* release is executed the insured remains in the

---

[48]Testimony of Eversberg, Frugé, and Hebbler.

[49]*See also Durel v. Howard*, No. 13-5991, 2013 WL 6499723, at *2 (E.D. La. Dec. 11, 2013) (Engelhardt, J.) ("In *Gasquet*, the plaintiff settled with the tortfeasor's primary liability insurer for less than policy limits and continued to pursue his direct action claim against the tortfeasor's excess insurer. Toward that end, the plaintiff released his claims against the

lawsuit as a "nominal" defendant while the plaintiff pursues recovery from the excess insurer.[50] *See, e.g.*, *Thistlethwaite v. Gonzalez*, 106 So. 3d 238, 244 n.1 (La. App. 5 Cir. 2012) ("Under the terms of the settlement agreement, Mr. Gonzalez and Veolia remained as nominal parties to the litigation, pursuant to the procedure outlined in *Gasquet* . . . ."); *Jones v. Capitol Enters., Inc.*, 89 So. 3d 474, 480-81 (La. App. 4 Cir. 2012) (explaining that after settlement and release of insureds "consistent with the applicable jurisprudence, particularly *Gasquet*," the insureds "remained in the suit as nominal defendants for purposes of future litigation to establish the liability, if any, of the excess insurer").

One of the key features of a *Gasquet* release is that although the insured remains a nominal defendant in order to allow the plaintiff to attempt to collect additional amounts from the excess insurer, the insured is not personally exposed to any further liability, including any amounts that the plaintiff cannot collect from the excess insurer–for example, if the excess insurer, goes bankrupt. All witnesses at trial agreed that they shared this understanding of the meaning and effect of a *Gasquet* release, and the parties likewise agree. The parties disagree, however, whether the release of Ameraseal and Thomas in the ASIC/Barrow settlement was a *Gasquet* release.

### 2.)     Louisiana Law Governing Interpretation of Settlements and Releases

The settlement agreement between ASIC, Ameraseal, Thomas, and Barrow is a compromise because it "is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La. Civ.

---

tortfeasor to the extent they might be recovered from the tortfeasor directly, but specifically reserved his claims against the tortfeasor to the extent that collectible coverage was afforded the tortfeasor 'by the said policy of excess insurance issued by Stonewall.'") (citations omitted).
    [50]Testimony of Eversberg, Frugé, and Hebbler.

Code. art. 3071. A compromise, like any other contract, "must be interpreted in accordance with the intent of the parties" and it "is governed by the same general rules of construction that are applicable to contracts." *Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So. 2d 1096, 1106-07 (La. 2005).

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. "A doubtful provision must be interpreted in light of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code art. 2053.

"Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract *unless the written expression of the common intention of the parties is ambiguous*." *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002) (emphasis added). Accordingly, when a provision is ambiguous, "parol evidence is admissible to clarify the ambiguity." *See Diefenthal v. Longue Vue Mgmt. Corp.*, 561 So. 2d 44, 51 (La. 1990); *see also, e.g.*, *Willard v. R&B Falcon Drilling USA, Inc.*, 836 So. 2d 424, 428-29 (La. App. 1 Cir. 2002) (admitting parol evidence to resolve an ambiguity in settlement agreement).

Interpretation of an unambiguous contract is a question of law, while interpretation of an ambiguous contract is a question of fact. *See Amoco Prod. Co. v. Tex. Meridian Resources*

*Exploration Inc.*, 180 F.3d 664, 668-69 (5th Cir. 1999); *see also Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co.*, 89 F.3d 243, 246 (5th Cir. 1996) ("[A]mbiguity in the terms of a contract gives rise to a fact question concerning the intent of the parties.").

### 3.)  Analysis of the Barrow/ASIC Settlement and Release

As set forth above, Barrow accepted ASIC's settlement offer on or about February 19, 2012.[51] In exchange for the limits of the ASIC primary policy, Barrow agreed to "[r]elease Ameraseal, LLC and Lamar Thomas from any liability for damages in excess of the available insurance limits provided by [ASIC] and the excess insurer, RSUI Indemnity Company, with Ameraseal, LLC and Lamar Thomas to remain as nominal defendants, only, in accordance with the customary practice approved in *Gasquet*, reserving unto Plaintiff her claim against RSUI Indemnity Company."[52] ASIC and RSUI disagree regarding the interpretation of this release, although they both claim their interpretation to be unambiguous.

According to RSUI, the release is not a *Gasquet* release because it does not prohibit Barrow from collecting additional amounts from the insureds. Rather, the express release language only releases the insureds "for damages in excess of the available insurance limits" of both policies; that is, although the insureds were released from liability in excess of $5,000,000.00, they were not released from liability between $1,000,000.00 and $5,000,000.00, and nothing in the language of the release itself would expressly prohibit Barrow from collecting up to an additional $4,000,000.00 from either RSUI or the insureds.

According to ASIC, the release is a *Gasquet* release because it expressly states that the

---

[51]R. Doc. No. 195, at stipulation 44.
[52]Exhibit 113.

14

insureds would "remain nominal defendants, only, in accordance with the customary practice approved in *Gasquet*, reserving unto [Barrow] her claim against RSUI."[53] Pursuant to this reading, the invocation of *Gasquet* clearly demonstrates the common intent that the insureds would be released from personal exposure and that Barrow would pursue any collectible insurance directly from RSUI with the insureds remaining only as nominal defendants.

The Court concludes that the settlement agreement is ambiguous because it contains language both consistent and inconsistent with an intent to execute a *Gasquet* release. On the one hand, the release states that it is "in accordance with the customary practice approved in *Gasquet*" and that the insureds would remain as "nominal defendants." On the other hand, the plain language of the settlement does not expressly prohibit Barrow from collecting a judgment of up to an additional $4,000,000.00 from the insureds, which is inconsistent with them being "nominal defendants, only."

Because the release is ambiguous, the Court may consider parol evidence to determine the intent of the parties.[54] Neither party presented relevant testimony from Barrow, an Ameraseal representative, or Thomas, regarding their understanding of the release or contractual intent.[55] The parties did, however, elicit testimony from (1) Eversberg, who negotiated the settlement on behalf

---

[53]Exhibit 113.

[54]RSUI, citing Louisiana Civil Code article 2056, suggests that the ambiguity should be construed against ASIC as the party who drafted Exhibit 113. R. Doc. No. 204, at 3. However, that Code article dictates that "[i]n case of doubt *that cannot be otherwise resolved*, a provision in a contract must be interpreted against the party who furnished its text." La. Civ. Code art. 2056 (emphasis added). As will be explained below, the doubt is resolved by the available parol evidence; accordingly, the Court need not apply article 2056. *See Rainbow USA, Inc. v. Crum & Forster Specialty Ins. Co.*, 711 F. Supp. 2d 655, 664 (E.D. La. 2010) (Fallon, J.) ("As a last resort, ambiguous terms should be construed against the drafter.").

[55]The parties submitted the depositions of Barrow and Thomas from the underlying case, which depositions necessarily predated the settlement.

of Ameraseal, Thomas, and ASIC; (2) Frugé, who negotiated on behalf of Barrow; (3) Colton, the

ASIC adjuster who authorized the settlement; and (4) Hebbler, RSUI's attorney at the time.

### a)      Drew Eversberg, Attorney for ASIC and the Insureds

At trial, Eversberg testified that he knows what a *Gasquet* settlement is, that attorneys in his

field know what *Gasquet* means, and that he has negotiated many *Gasquet* settlements in the past.

Eversberg testified that it was his understanding and intention that the ASIC/Barrow settlement

contained a *Gasquet* settlement and that as a result the insureds would have no further personal

exposure to Barrow. Eversberg testified that he would not have made a settlement offer that did not

resolve all of the insureds' personal exposure to Barrow. The Court finds Eversberg's testimony as

to this issue to be credible.[56]

Furthermore, the Court finds that Eversberg's testimony at trial is corroborated by

contemporaneous statements he made in connection with the negotiation and execution of the

settlement. Before settling, Eversberg told Frugé that any settlement demand from Barrow would

have to be "one that can be accepted – limits for release of insured. If the insured won't be protected

then the insurer can't accept it."[57] Prior to making the offer, Eversberg, consistent with a *Gasquet*

release, explained to Colton and the insureds that he planned to negotiate a settlement that would

"keep Lamar Thomas and Ameraseal as defendants to the case" so that Barrow could "proceed

against the excess insurer, but with the understanding that there could never be a judgment with any

---

[56]RSUI cites a portion of Eversberg's testimony to attempt to suggest that Eversberg admitted that a judgment could be entered against the insureds. R. Doc. No. 204, at 5-6. Reviewing that testimony, the Court finds that it is consistent with the insureds remaining as *nominal* defendants for the purpose of Barrow's pursuit of RSUI's excess policy.

[57]Exhibit 108.

16

monetary exposure to Lamar Thomas or Ameraseal."[58] After the offer was made but before Barrow had accepted it, Eversberg explained to Colton and the insureds that the proposed settlement "releases Ameraseal and Thomas for any personal exposure."[59] Once Barrow accepted the settlement offer, Eversberg circulated to Colton a draft of a final release and receipt which contained express *Gasquet* language prohibiting Barrow from collecting anything more from the insureds.[60] On February 22, 2012, Eversberg's associate, Brad Boudreaux ("Boudreaux"), sent a letter to Hebbler asserting that a settlement had been reached between Barrow, ASIC, and the insureds "in accordance with *Gasquet*" and that the insureds "will remain in the case as nominal defendants."[61]

The Court finds that the contemporaneous statements noted above corroborate Eversberg's testimony at trial that he believed that he had negotiated and obtained a *Gasquet* release for the benefit of Ameraseal and Thomas.

### b)    Michael Frugé, Attorney for Barrow

Frugé testified that he understands what a *Gasquet* release is, that attorneys who work in this area of the law know what *Gasquet* means, and that he has negotiated many settlements containing *Gasquet* releases in the past. He testified that it was his understanding and intention that the ASIC/Barrow settlement contained a *Gasquet* release that prohibited Barrow from collecting any additional amounts from the insureds and released the insureds from any further exposure to

---

[58]Exhibit 111.

[59]Exhibit 114.

[60]Exhibit 125. The parties disagree whether Frugé saw a copy of this draft. R. Doc. No. 203, at 14; R. Doc. No. 206, at 10-11. At trial, Frugé's testimony was uncertain as to this point. Furthermore, neither party presented any documentary evidence indicating that this draft was forwarded to Frugé. Accordingly, the Court does not find that Frugé saw Exhibit 125. The Court further finds that this draft document only corroborates Eversberg's testimony at trial regarding his understanding of the terms of the settlement.

[61]Exhibit 121.

personal liability. The Court finds Frugé's testimony to be credible as to this issue.

The Court finds that Frugé's contemporaneous statements regarding the settlement and release are ambiguous because they are consistent with either proposed interpretation of the settlement agreement. For example, after receiving the settlement offer from ASIC, Frugé sent Exhibit 117, an email to Woolridge, an attorney for Ameraseal, stating that Barrow was "close to resolving with the underlying insurer, who is protecting your clients' interest and will ensure no excess judgment can be rendered against your client, i.e. they will have no further exposure above the excess insurance," and that the insureds "will be off the hook for any future liability."[62] This characterization of the settlement is consistent with either reading of the ambiguous language of the settlement agreement; the statement that the insureds "will have no further exposure above the excess insurance" tends to support RSUI's interpretation, but the statement that the insureds "will be off the hook for any future liability" tends to support ASIC's interpretation. Accordingly, this exhibit is clarified by Frugé's credible express testimony at trial that he understood the release to be a *Gasquet* release.

RSUI also relies heavily on Exhibit 126, a February 27, 2012 letter Frugé sent to Hebbler, in which Frugé stated that the ASIC/Barrow settlement "does not seek the dismissal of your insureds, only [ASIC]," that the insureds "are still on the hook from $1 million to $5 million, which is your client's layer of insurance," and that RSUI "has a skin in."[63] At trial, Frugé explained that he could not seek dismissal of the insureds because if the insureds were not nominal defendants, Barrow's "claim against RSUI would go away."[64]

---

[62]Exhibit 117.
[63]Exhibit 126.
[64]R. Doc. No. 205-1, at 15.

The Court finds that Exhibit 126 is not a definitive statement that Frugé did not think that

Barrow had executed a *Gasquet* release of the insureds. Exhibit 126 just adds to the ambiguity which

was clarified by the testimony at trial.[65] The Court finds that Frugé knew what a *Gasquet* release

---

[65]Frugé testified as follows at trial, which the Court draws from the complete transcript of his testimony prepared by the court reporter and provided to the Court as well as the parties:

THE COURT: When you say in Exhibit 126, "they are still on the hook from a million to the five million," who's the "they"?

THE WITNESS: The excess carrier. Judge, that's where the confusion is. They're still on the hook; meaning, as nominal defendants they are still in the case and, therefore, the excess has to pay the judgment for them. If I dismiss them and I release them, then they're not on the hook. The nominal defendants have to be there for me to collect against the insurance.

THE COURT: Well, you said the offer merely releases them from any judgment above five million. Who is the "them"?

THE WITNESS: The insureds.

THE COURT: The insureds?

THE WITNESS: Yes, sir. And actually the carrier. It basically releases everybody over five million. And they get a credit for the first million, so that's why I say, "From one million to five million, which is your client's layer of insurance, that I do believe the excess has a skin in."

THE COURT: But your testimony is, notwithstanding this language, at least you believe that the insureds were released against any personal exposure; is that right?

THE WITNESS: That I could not collect against them, yes, sir. They're not–they're not released, I couldn't collect it.

Q. That is correct, they are not released. You're just saying you wouldn't collect against them, but they were not released from this case?

A. They have to remain in the case. And if they're dismissed from the case, then the claim against RSUI goes away. That's under *Gasquet*.

Q. If they are dismissed from the case, why do they have to show up at trial in March?

A. Because they are nominal defendants and I have to proceed against somebody.

Q. And who is that somebody?

A. The insureds.

Q. So you're going to take, again, a judgment against them. And the only way you can execute that judgment is against those defendants?

A. No, that's not true. I am not going to execute the judgment against the insureds. I'm going to execute the judgment – I'm going to ask RSUI to pay it, and if they don't pay it, then I'll file a declaratory judgement action. I could not proceed against them personally. If I did then I would –

THE COURT: Against who?

THE WITNESS: The insureds, Ameraseal and Lamar Thomas. When I accepted – let me be clear, Judge, I keep saying, "I, I." When Ms. Barrow accepted the million dollars, she understood and knew that she could not proceed against the insureds, that it was only against the

encompassed and that his explanation of Exhibit 126 is credible and consistent with his trial testimony that he intended to and did include a *Gasquet* release of the insureds in the ASIC/Barrow settlement.

### c)      Brent Colton, ASIC's Adjuster

The Court also heard testimony from Colton, the ASIC claims adjuster assigned to the claim at the time of the settlement. Although Colton is not an attorney and he did not draft the settlement or the release, he authorized Eversberg to offer ASIC's policy limits to Barrow. Colton credibly testified that he did not give Eversberg authority to offer ASIC's policy limits in exchange for anything other than a complete release of the insureds.[66]

Furthermore, a claims file note by Colton attributes to Eversberg the pre-settlement opinion that "if our settlement effectively protects the insd and insd driver by getting covenants not to execute against them and limiting pltf's additional recovery to proceeds available under the excess policy, then the exhaustion of our policy limits may be a good faith action that would relieve us of further defense obligation through settlement."[67] Eversberg testified that he would have explained *Gasquet* releases to Colton.[68] This testimony by Colton and Eversberg is consistent with the release being a *Gasquet* release.

### d)      George Hebbler, RSUI's Attorney

RSUI also elicited testimony from Hebbler regarding his understanding of the *Gasquet* release. Hebbler did not represent a party to the ASIC/Barrow settlement and, therefore, the Court

---

excess carrier.
[66]Testimony of Colton.
[67]Exhibit 112.
[68]Testimony of Eversberg.

finds that his personal understanding of the language of the settlement is not relevant to discerning the common intent of the parties to that settlement. Any opinion by Hebbler regarding whether or not the settlement included a *Gasquet* release is merely his own legal opinion of the interpretation of the document and the Court attributes no evidentiary weight to such testimony.

### e)	Conclusion

Considering the testimony and evidence, the Court finds by a preponderance of the evidence that the parties to the ASIC/Barrow settlement intended it to include a *Gasquet* release of the insureds.

## C.	The Insureds' (and RSUI's) Rights Against ASIC after the *Gasquet* Release

The next step is to determine the effect of the *Gasquet* release on the insureds' rights against ASIC–which, as explained above, are the only rights RSUI may pursue through subrogation. As will be explained below, the Court agrees with ASIC that the *Gasquet* release is dispositive of RSUI's claims in this case.

### 1.)	The *Gasquet* Release Defeats the Insureds' (and RSUI's) Claim

A primary insurer is liable for an insured's "*damages* that are a direct consequence of its bad faith failure to perform." 557 So. 2d at 969 (emphasis added). "Damages" plainly means more than ultimate out-of-pocket loss; in *Great Southwest* the insured ultimately suffered no actual out-of-pocket loss because it had excess insurance. *See id.* 557 So. 2d at 966. But that fact was no barrier to the insured's rights against the primary, because "[t]he fact that an obligation created by the . . . wrongful act of an obligor may be performed by a third person does not prevent the obligation from arising." *Id.* at 968. "Otherwise, even a tortfeasor would not be obliged to repair the damage to another caused by his fault whenever insurance was potentially available to compensate for the

21

injury." *Id.* The injury to the insured was the entry of the enforceable judgment against it as a result of the primary's alleged bad faith and the exposure to that excess liability. As the Fifth Circuit framed this issue when it remanded the case, if ASIC's alleged bad faith "caused *exposure* of the *insured* to an increase in the settlement value of the case above the primary policy limit, which the excess insurer must then satisfy *on the insured's behalf*, the excess insurer has a subrogated cause of action against the primary insurer for any payment above what it otherwise would have been required to pay." 768 F.3d at 382 (emphasis added).

Because Barrow executed a *Gasquet* release of the insureds, the insureds were no longer exposed to any personal liability to Barrow (although they remained as nominal defendants so that Barrow could pursue collectible excess coverage from RSUI). Therefore, notwithstanding ASIC's alleged bad-faith conduct, such conduct ultimately did not increase the insureds' exposure to liability above the primary level. The Court concludes that this complete protection from exposure to liability above the primary policy limits precluded any claim by the insureds against ASIC for damages. Accordingly, RSUI's subsequent settlement with Barrow was strictly a result of RSUI's contractual obligation to the insureds, and not a payment of any amount which the insureds would ever have to pay Barrow.

The Fifth Circuit's opinion in *Gibbs v. Liberty Mutual Insurance Co.*, although terse, confirms that the plaintiff's release of an insured is fatal to the claims of any excess insurer attempting to subrogate to the insured's claim against a primary insurer. *See* 902 F.2d 361, 362 (5th Cir. 1990). *Gibbs* also involved an attempt by excess insurers to recover alleged overpayments from a primary insurer. *See Gibbs v. Liberty Mut. Ins. Co.*, 876 F.2d 23 (5th Cir. 1989). Because the Louisiana Supreme Court had not yet decided *Great Southwest* and Louisiana law was unclear as

to whether primary insurers owed a duty to excess insurers, the Fifth Circuit certified that question to the Louisiana Supreme Court. *Id.* at 24. On the same day that it issued *Great Southwest*, the Louisiana Supreme Court answered the certified question in the negative. *Gibbs v. Liberty Mut. Ins. Co.*, 557 So. 2d 972 (La. 1990). After receiving that answer, the Fifth Circuit restated the now clarified law that the primary did not owe a duty to the excess, but that the excess could "seek recovery against the primary insurer to the extent the excess insurer was subrogated to the rights of the insured." 902 F.2d at 362. The parties in *Gibbs* conceded "that the insured . . . *had been fully released* and thus *had no liability to which the excess carrier could be subrogated*." *Id.* (emphasis added). Accordingly, the excess insurers could not recover from the primary because there was no claim of the insured against the primary to which they could subrogate. *See id.*

As was the case in *Gibbs*, as a result of the *Gasquet* settlement the insureds were "fully released and thus had no liability to which the excess carrier could be subrogated." *See id.* The insureds had no claim for recovery against ASIC and, consequently, RSUI has no subrogated claim against ASIC.

### 2.) RSUI Misunderstands the Effect of the *Gasquet* Release

RSUI contends that even if Barrow executed a *Gasquet* release of the insureds, *Great Southwest* still allows it to recover from ASIC under these circumstances. RSUI is wrong.

First, RSUI contends that the *Gasquet* release is not dispositive because "under *Great Southwest* it is irrelevant whether the insureds actually sustained a loss in order for RSUI to recover against ASIC."[69] This argument confuses an insured's lack of actual out-of-pocket damages with its exposure to loss. The insured in *Great Southwest* did not sustain an actual out-of-pocket loss because

---

[69] R. Doc. No. 204, at 6.

it had excess insurance to cover the judgment in excess of the primary policy, but the insured was nonetheless *exposed* to that excess judgment and the insured therefore had a claim against the primary insurer for allegedly causing that exposure. The excess insurer satisfied that exposure, thereby becoming subrogated to the insured's claims against the primary for causing that exposure. As explained above, this case is unlike *Great Southwest* because, as a result of the *Gasquet* release, the insureds were no longer exposed to personal liability to Barrow.

Second, RSUI asserts that "ASIC would never have been able to obtain a release of itself and a partial release of the insureds unless the insureds had purchased excess insurance."[70] Therefore, according to RSUI, "[a]ccepting ASIC's argument that it is not required to pay for amounts covered by excess insurance would allow ASIC to profit from the insureds['] prudence in obtaining excess insurance."[71] The Court is not persuaded.

RSUI may be right that ASIC could not have obtained the *Gasquet* release of the insureds without the potential availability to Barrow of additional settlement funds from the RSUI excess policy. However, the fact remains that ASIC did obtain the *Gasquet* release for the insureds who thereafter were no longer personally exposed to any liability to Barrow. Although ASIC may have left RSUI in a difficult position under the circumstances of this case, ASIC did not owe any duty to RSUI which would allow RSUI to recover directly from ASIC.

RSUI's remaining arguments likewise do not persuade. For example, to distinguish *Gibbs*, RSUI asserts that "the plaintiffs did not assert a subrogation claim in *Gibbs*."[72] Such an assertion finds little support in the text of the opinion, which plainly states that the excess insurers did not

---

[70] R. Doc. No. 204, at 11.
[71] R. Doc. No. 204, at 11.
[72] R. Doc. No. 204, at 8.

have a subrogation claim against the primary because the insureds "had no liability to which the

excess carrier could be subrogated." 902 F.2d at 362.  RSUI also states that "[u]nlike the plaintiffs

in *Gibbs*, [it] does not concede that" the complete release of the insureds is fatal to "its subrogated

cause of action."[73] But failure to concede this point is no substitute for an explanation as to why it

is incorrect; RSUI still must articulate how ASIC was liable *to the insureds* in this case as the

*Gasquet* release protected the insureds from any personal exposure to Barrow. RSUI has failed to

do so.

　　In support of its claim, RSUI also cites *St. Paul Insurance Co. of Bellaire, Texas v. AFIA*

*Worldwide Insurance Co.*, 937 F.2d 274 (5th Cir. 1991). The *St. Paul* case is not apposite; in *St.*

*Paul*, the Fifth Circuit merely remanded a case for further consideration of an excess/primary claim

in light of *Great Southwest*. *See id.* at 278, 281. The Fifth Circuit's opinion said nothing whatsoever

about the effect of a *Gasquet* release on an excess insurer's attempt to subrogate to an insured's

claim.[74]

　　Finally, RSUI argues that the collateral source rule should apply and prevent ASIC from

escaping liability simply because the insureds had excess insurance for their excess exposure.[75] As

the Louisiana Third Circuit Court of Appeals explained in the intermediate appellate opinion which

the Louisiana Supreme Court reviewed in *Great Southwest*, "[u]nder the 'collateral source' rule our

---

[73]R. Doc. No. 204, at 8.

[74]*St. Paul* characterized the "essential requirements of subrogation" of an excess insurer
against a primary insurer as "(i) payment . . . and (ii) bad faith." 937 F.2d at 274. The "payment"
was of a portion of a settlement after a trial and an enforceable judgment was entered against the
insured. *See id.* at 276. Accordingly, the excess insurer in *St. Paul* was in a position similar to the
excess insurer in *Great Southwest*, and neither case involved a *Gasquet* release that terminated
any possible exposure of the insured to liability above the primary policy limits.

[75]R. Doc. No. 204, at 10-11.

courts permit recovery of damages incurred by a plaintiff which he will never have to pay since they have been paid from another source." *Great Southwest Fire Ins. Co. v. CNA Ins. Cos.*, 547 So. 2d 1339, 1347-48 (La. App. 3 Cir. 1989). As explained above, the insureds were no longer exposed to any personal liability to Barrow pursuant to  the *Gasquet* release. Accordingly, the amount that RSUI paid to Barrow was not an amount which the insureds would otherwise have had to pay and the collateral source rule is inapplicable.

3.)    <strong>Conclusion</strong>

For the foregoing reasons, the Court finds that judgment should be entered in favor of ASIC and against RSUI on this basis alone.

**II.    Causation**

Alternatively, if the release was not an enforceable *Gasquet* release or if the *Gasquet* issue is somehow not dispositive, then by paying $2,000,000.00 to Barrow to settle the insureds' excess exposure, RSUI became subrogated to whatever claim the insureds may have had against ASIC for causing or increasing that exposure. *See RSUI*, 768 F.3d at 382. But RSUI is not entitled to recovery simply by proving ASIC's bad faith; as the Fifth Circuit noted in remanding, "RSUI still must prove its case, including the issue of causation." *Id.* at 381. Accordingly, the Court directed the parties to address in their post-trial briefing "causation, including but not limited to the effect of a finding by the Court that ASIC abandoned a viable comparative fault defense."[76]

**A.    Causation in the Primary/Excess Litigation Context**

In *Great Southwest*, the Louisiana Supreme Court discussed apportionment between primary and excess insurers. *See* 557 So. 2d at 969. In that case, the primary and excess insurer owed a

---

[76]R. Doc. No. 201, at 1.

solidary obligation to their common insured in the amount of the excess judgment entered against the insured. *See id.* at 967-968. The primary insurer was potentially obligated to the insured for the excess amount because its failure to defend the insured in good faith allegedly caused the excess judgment and, therefore, the primary's obligation was "in the nature of a penalty imposed for a wrongful act." *Id.* at 969. The excess insurer was obligated to the insured for the excess amount because it contractually assumed that obligation through the policy of excess insurance. *See id.* Because it was a solidary obligation, when the excess insurer satisfied the excess judgment pursuant to its contractual obligation to the insured, the excess insurer also satisfied the primary insurer's obligation. *See id.* at 968.

The Louisiana Supreme Court noted the general rule that "the solidary obligor who extinguishes the debt is entitled to a right of contribution against his codebtors, but must divide his action so that he can demand from each one of them no more than his virile portion." *Id.* (citing La. Civ. Code art. 1804). The "virile portion" of an obligor whose obligation "arises from an offense or quasi-offense . . . is proportionate to the *fault*" of the obligor. La. Civ. Code art. 1804 (emphasis added). Accordingly, the primary insurer, whose obligation was "in the nature of a penalty imposed for a wrongful act," was liable to the excess insurer only to the extent of the primary insurer's fault in causing an excess judgment as a result of its bad faith.

"Under the circumstances alleged in" *Great Southwest*, the Louisiana Supreme Court concluded that the primary insurer was the principal obligor for the whole amount of the excess judgment. *See* 557 So. 2d at 969. But whether a primary insurer would be liable to the insured (and, through subrogation, to the excess insurer) for all or only part of the increase in the insured's exposure is a case-by-case determination. *See id.* ("[W]hether the solidary obligor who extinguishes

27

the debt is entitled to full indemnification or only contribution of virile portions, calls for an exercise of judgment after weighing all of the circumstances and policy considerations.").

In its opinion in this case, the Fifth Circuit stated that causation is "grist for the mill of the factfinder." 768 F.3d at 381 n.4. The Fifth Circuit recognized outstanding and unanswered questions such as whether "additional defensive actions by [ASIC], such as deposing the plaintiff's doctors or seeking to defeat liability on the ground that the plaintiff was at least partially responsible for the accident, would have led to the plaintiff making a settlement offer below the primary limit." *Id.* It is RSUI's burden to prove causation. *See id.* at 381 & n.4.

The parties have not directed the Court to legal authorities which provide helpful guidance with respect to how a plaintiff excess insurer can prove how much of its excess settlement was attributable to a primary insurer's bad-faith performance of its duties.[77] RSUI complains that it should not be held to "a new and impossible standard for excess insurers to meet in subrogation claims that would require the excess insurer, after the case is over, to do all of the things that the primary insurer should have done in defense of the underlying lawsuit."[78] But RSUI still must show that a different defense would have led to a different, less expensive settlement; if it cannot make that showing, then it has not satisfied its burden of demonstrating that any breach of ASIC's duty *caused* an increase of the amount RSUI paid to Barrow.

**B.     Analysis**

---

[77]ASIC cites *Twin City Fire Insurance Co. v. Country Mutual Insurance Co.* as providing an example of such proof. In that case, the excess insurer presented at trial a letter by counsel for the primary insurer recording a rejected settlement demand of $500,000 for a claim that later was settled for a total of $1,000,000. *See* 23 F.3d 1175, 1177-78, 1181-82 (7th Cir. 1994). There is no such letter in this case.

[78]R. Doc. No. 206, at 6.

In its post-trial briefing, RSUI demands from ASIC the entire $2,000,000.00 it paid to Barrow.[79] RSUI contends that "[i]t was ASIC's failures, and its failures alone, that led to a settlement in excess of the primary policy limit."[80] ASIC, on the other hand, asserts that Barrow's claim "was worth far more than $1 million at all times and "the value of the claim was a function of the plaintiff's serious injuries, the venue, and her capable counsel and *not* ASIC's counsel's handling of the defense."[81] For the purpose of deciding this causation issue, the Court will assume that every deficient action or inaction taken by ASIC constituted "bad faith" and can be asserted by RSUI through subrogation to the rights of the insureds.

First, the Court finds as a factual matter that RSUI has not proved by a preponderance of the credible and admissible evidence that the Barrow case could ever have been settled within ASIC's primary policy limits. The record establishes that Barrow was prepared to offer evidence of significant injuries which, if accepted by the jury, could have resulted in a substantial verdict certainly in excess of the primary policy.[82] Frugé testified at trial that he intended to ask the jury to award Barrow $10,000,000.00.[83] The Court finds credible Frugé's testimony that he had no reason to believe that Barrow would ever have accepted a total settlement offer of less than

---

[79]R. Doc. No. 204, at 13, 23.

[80]R. Doc. No. 206, at 8; *see also* R. Doc. No. 204, at 21 ("[I]f ASIC had properly defended the case and made an offer at a time when it actually had some negotiation leverage, the plaintiff very well may have accepted an offer within ASIC's policy limit to fully settle the case.").

[81]R. Doc. No. 203, at 18 (emphasis in original).

[82]Testimony of Frugé, R. Doc. No. 203-1, at 38-39. The exhibits from the underlying case and the testimony at trial in this case establish that had the Barrow case proceeded to trial, Frugé could have presented evidence which could have supported a verdict in excess of the primary and excess policy limits.

[83]Testimony of Frugé, R. Doc. No. 203-1, at 36.

$3,000,000.00.[84]The Court finds credible Frugé's testimony at trial that at all times he valued Barrow's case at between $4,000,000.00 and $5,000,000.00.[85]

RSUI presented no convincing evidence that a different good-faith defense by ASIC would have revealed specific weaknesses in Barrow's case, either as to liability or as to damages, that would have resulted in a settlement within ASIC's primary policy limits.[86] Arguing that Barrow's claim could have been settled within the primary policy limit, RSUI relies in large part on what ASIC thought Barrow's claim was worth during the pendency of the underlying case.[87] This reliance as to what ASIC thought Barrow's claim was worth at the time is in some tension with RSUI's complaint that ASIC did not do enough to learn about Barrow's claim. At any rate, RSUI did not produce convincing evidence at trial which would support a conclusion that any of ASIC's below-limit valuations of Barrow's claims were settlement amounts that would ever have been acceptable to Barrow.

Although RSUI contends that "if ASIC had properly defended the case and made an offer at a time when it actually had some negotiation leverage, [Barrow] very well may have accepted an offer within ASIC's policy limit to fully settle the case,"[88] RSUI presented no convincing evidence at trial in support of that bald speculation. To the contrary, the only settlement demand from Barrow was for the combined limits of both the ASIC and RSUI policies.[89] As was previously stated, the Court finds that RSUI has not proven by a preponderance of the evidence that the Barrow case could

---

[84]Testimony of Frugé, R. Doc. No. 203-1, at 40.
[85]Testimony of Frugé, R. Doc. No. 203-1, at 39.
[86]The Court will address below the arguments related to ASIC's failure to oppose partial summary judgment with respect to the issue of liability.
[87]R. Doc. No. 204, at 19-20; R. Doc. No. 206, at 3-4.
[88]R. Doc. No. 204, at 21.
[89]Exhibit 109.

ever have been settled within the primary policy limit.

RSUI takes an all-or-nothing approach and it does not alternatively argue for some fraction of the $2,000,000.00 it paid to Barrow. Nonetheless, the Court will examine whether the credible and admissible evidence at trial supports a finding that a good-faith defense by ASIC would have reduced (but not eliminated entirely) RSUI's settlement with Barrow.

RSUI argues that ASIC's failure to oppose the motion for partial summary judgment as to liability had a concrete or measurable effect on the settlement value of the case. As explained above, after Brumfield did not file an opposition or appear at the hearing, the state court granted the motion and held Thomas entirely at fault for the accident.[90] The Court finds that there was sufficient evidence in the discovery provided to ASIC regarding Barrow's speed at the time of the accident with which to oppose the motion for summary judgment on the basis that Barrow was at least partially at fault.[91]

RSUI's argument is defeated by the credible testimony of Frugé, who stated that losing the motion for partial summary judgment "wouldn't have mattered" to him.[92] Frugé also testified at trial that he did not "give any credence" to any comparative fault argument and believed that the jury would have found Thomas entirely at fault based on his understanding of the facts and his personal familiarity with the intersection where the accident occurred.[93] Although being able to argue

---

[90]Exhibit 46.
[91]Exhibit 7 (claim file note stating that Thomas said Barrow was speeding); Exhibit 29 (medical record indicating Barrow was speeding); (medical record signed by Barrow stating she was speeding). Although RSUI retained Blaschke, an accident reconstruction expert, in this case, it did not ask Blaschke to perform a complete accident reconstruction and he did not perform one.
[92]Testimony of Frugé, R. Doc. No. 203-1, at 25.
[93]Testimony of Frugé; R. Doc. No. 203-1, at 30.

comparative fault in settlement negotiations or to a jury is, in the abstract, preferable to having liability decided against a defendant insured, the fact that the state court granted the motion for partial summary judgment did not affect the settlement value of Barrow's case.

Frugé testified at trial that nothing ASIC could have done in the underlying case would have affected his valuation of his client's claims.[94] Frugé explained that he was familiar with the pool of experts that ASIC might have hired and that, during the course of evaluating Barrow's claim, he took into consideration any such defense experts.[95] Accordingly, although ASIC certainly could have provided a better defense, the Court concludes that RSUI did not prove that any particular failure had a measurable effect on the settlement value of the Barrow case.

In sum, whether any of ASIC's breaches of its duty to the insureds increased the amount RSUI had to pay Barrow to settle the excess exposure is a fact question as to which RSUI bore the burden of proof. *See RSUI*, 768 F.3d at 381-82 & n.4. Having heard the trial testimony and reviewed the exhibits, the Court finds that RSUI did not meet its burden of proof and that it failed to demonstrate that ASIC's handling of the Barrow lawsuit increased the amount that was required to settle the Barrow lawsuit. The Court further finds that the total settlement value actually paid was driven by the nature and extent of Barrow's injuries and claims and by Frugé's evaluation of the Barrow case. Accordingly, and as an alternative to the *Gasquet* issue addressed above, judgment should be entered in favor of ASIC and against RSUI on the basis that RSUI has not satisfied its burden of proof regarding the causation issue.

---

[94]Testimony of Frugé, R. Doc. No. 203-1, at 36 ("Q. Is there anything that the defense could have done in this case at any time that would have changed what you evaluated this case? A. No.").

[95]*See* R. Doc. No. 203-1, at 38.

**CONCLUSION**

For the foregoing reasons, the Court will enter a judgment in favor of ASIC and against

RSUI as to all claims, with costs to be assessed against RSUI.


New Orleans, Louisiana, August 26, 2015.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**